27 463
47 261
47 271

## OCTOBER TERM, 1876.

### In the matter of the probate of the will of THOMAS ALEXANDER, deceased.

1. A testator, by his will, gave power to his son, a semi-imbecile, to make a testamentary disposition, under a certain restriction, of the property given to him by the will. *Held*, that this fact not only did not establish the testamentary capacity of the son, but was to be treated as the opinion, merely, of the father in regard to the son's competency to make a will. *Held also*, that the will of a person *non compos mentis*, could not be sustained as the execution of a power.

2. The will under consideration, *held* to have been the result of undue influence.

On appeal from the decree of the Orphans Court of Essex county.

*Mr. A. Q. Keasbey*, for appellants.

*Mr. T. N. McCarter*, for respondents.

THE ORDINARY.

Thomas Alexander, late of the city of Newark, in this state, died there in December, 1873. On the 2d of January, 1872, he executed, at the office of Messrs. Frelinghuysen and Kirkpatrick, in the presence of two witnesses, one of them the first named of those gentlemen, a paper purporting to be his last will and testament. This document had been drawn for him by the other member of the firm, who is named therein as one of the executors. By it he gave to his brother Reverdy $300, and to his sister Margaret, $600. He also gave to his nephew, Stewart B. Linthicum, $1000, and to his niece, Eliza Kerr, $500, to be held in trust for them respectively, by the executors, until they should respectively have attained the age of twenty-one years, and then to be paid to them, with all accumulations. These two legacies were to lapse and fall into the residue of his estate, in case of the death of the legatees in his lifetime or before attaining the age of twenty-one years. To Allen Griffith he gave a chest of tools, which belonged to him, the testator, before the death of his father, Thomas S. Alexander. All the rest of his property he gave to his sister Mary, now Mrs. Bingham. From the decree of the Orphans Court of Essex county, admitting this document to probate as his last will and testament, this appeal was taken.

The testator, though at the time of executing the instrument in question, was of mature years, being then thirty-eight years old, was, as he had been from his childhood, of a very low grade of intellect. His boyhood and youth had been spent in Maryland, where his father long practiced the legal profession, of which he was a distinguished member. In 1866, the latter removed to Newark, bringing the testator with him as one of his family, and the testator resided with him there until his father's death, which occurred on the 4th of December, 1871. His father, by his will and the codicil thereto, after certain specific legacies and a small pecuniary one, gave all the residue of his estate to his four children and his granddaughter, the child of his deceased daughter. As to Thomas' share, which was one-sixth of the residue, he made the follow-

ing provision : " I desire and empower my executors to retain my son Thomas' part or share of my estate, and invest the same in some interest-bearing public stock or evidence of debt, and to apply the income or profits of such investment, or such part or parts thereof as they, in their discretion, may think necessary and expedient, to the support of my said son for and during the term of his natural life.  I vest in them this large discretion because of the facility of the disposition of my said son, and to protect him against the practices of designing men.  I desire that any surpluses of income, which may, at any time, remain over what may be expended on his proper maintenance, shall be invested in like manner.  He is to have the power of disposing of the said principal fund and its accumulations, by last will, to and among his brothers and sisters and niece and their descendants, or such of them as he may prefer, and as he may think proper ; and in the absence of any valid disposition thereof as aforesaid, the said fund and its accumulations are to go to the person and persons who, at the time of his death, may be designated by law as his personal representatives, and in proportions as determined by law."  He appointed Thales A. Linthicum (to whose wife, his daughter Emma, he gave one-third of the residue,) and his nephew, Julian J. Alexander, his executors.  Both of them proved the will and codicil and accepted the trust.  After the death of his father, Thomas, the testator, whose will is under consideration, continued to live in the family mansion in Newark, with his sister Mary, who was then unmarried, for many months, and until she left this state.  The testator was, at best, a semi-imbecile.  His very personal appearance indicated his deficiency in mental capacity.  While the testamentary witnesses and others, sworn before the Orphans Court, testify to his competency, in their opinion, to make a testamentary disposition of his property, it is, from the evidence, too clear for question, that he was, at best, a very feeble-minded man.  His father anxiously endeavored by means of his own association with him and otherwise, to strengthen his intellect.  He placed him in a training school under an

experienced and skillful educator of the feeble-minded. At one time, partly to break up habits of intemperance, which he had formed, the testator was sent by his father to the Maryland Hospital, where he remained for a considerable period. While the result of these efforts was, probably, some improvement, he nevertheless, up to the time of his death, was justly regarded as a person of very feeble intellect. Mr. Haines, one of the testamentary witnesses, speaking of his condition at the time of executing the will, says, from what he observed of him, he had "no reason to think he was anything but sound." His acquaintance with him, however, was, he says, but very slight. The other testamentary witness, Mr. Frelinghuysen, was somewhat acquainted with him. He says that while the testator, in his opinion, had not a sound mind, he had sufficient intellect to dispose of his property; that he knew what he was doing, what disposition he was making of it, and to whom he was giving it. Mr. Kirkpatrick, one of his executors, by whom the will was drawn, says he thinks that he perfectly understood the manner in which he disposed of his property, and he adds that he gave his directions clearly. Numerous witnesses testify on the subject of the testator's capacity. Of these, many are persons of high social position in Maryland and elsewhere, some of whom were acquainted with him from his childhood. Their testimony leads to the conclusion that before he came to this state, he was of so low a grade of intellect as to be incapable of transacting any business whatever, and if he had testamentary capacity, it was merely such as would satisfy the lowest requirements of the law. I deem it unnecessary to refer particularly to their testimony. The testimony of those witnesses who speak on the subject from their knowledge of him after he came to Newark to reside, makes it evident that his capacity had not materially increased. Mr. Thomas T. Kinney, one of these witnesses, who knew him well, and whose opportunities for observation were good, says he used to hear him spoken of as an idiot, and thought the matter over, and concluded he was not

exactly that, but thought he was of rather a low grade of. intellectual development—a feeble-minded young man, but not an imbecile.   He says, in explanation, "I thought he was of a very low grade of mind, though not an idiot, because I always had the idea that an idiot had no mind at all, and Tommy had a mind up to a certain point."   It is in evidence that as late as July, 1872, five months after the making of the will, his sister, Mrs. Bingham, contemplated placing him in a training school for feeble-minded persons.   It was urged by the counsel of the proponents, on the hearing of this appeal, that the fact that his father had, with full knowledge of his mental condition, provided in his will for the exercise, by the testator, of the power of testamentary disposition of his share of his father's estate, should have great weight in determining the question of capacity.   It is, however, only evidence of the opinion of his father, and is of no legal value in determining the question.   It was also contended, on behalf of the proponents, that if there be doubt as to the testator's capacity, the will ought, in view of the above-quoted provision of his father's will, to be regarded as the execution of a power.   But, surely, it is not necessary to say that an idiot or lunatic cannot execute a power involving the exercise of discretion, even though it should appear that the donor knew, at the time of the grant of the power, that the donee was *non compos mentis*.

The view which I take of this case, however, renders it unnecessary to pass upon the question of the testator's capacity; except as connected with the question of undue influence.   That he was of a facile disposition and liable to be imposed upon, is evident from all the testimony. His father. vested a large discretion in his executors as to the testator's share of his estate, expressly because of the facility of the latter's disposition, and to protect him against the practices of designing men ; and he limited the exercise of the power of testamentary disposition.   The testimony shows unmistakable evidence of undue influence over the testator by his sister Mary, the principal legatee, to whom he gave almost all of his estate.   That she design-

edly influenced his mind against his sister Emma and the executors of his father's will, who were trustees of his share of his father's estate, and one of whom was the husband of Emma, and that she procured him to make a will of his property while he was under that influence, exerted not only against Emma, but in her own favor, abundantly appears. By such a person as he, confinement in an asylum, of which he had had some experieace, is regarded with ineffable dread, and no greater cause of enmity can be presented to the mind of such a one than the imputation of a design, on the part of another person having, or being supposed to have, some right to control over him, to subject him to such confinement. That the legatee referred to had filled the testator's mind with apprehensions of the intention on the part of his sister Emma and the executors of his father to put him into an insane asylum, with a view to getting his estate for themselves, is manifest. In her testimony she admits that she told him that the executors and his sister Emma had said that he ought to go to the hospital. As early as the 19th of December, 1871, which was but about two weeks after his father's death, she obtained the certificates of two physicians in Newark as to his condition, with reference to the necessity of putting him into an insane asylum, when, according to the evidence, nobody had proposed to put him there. The effect of her influence in this direction is seen in the testimony of Mr. Kinney, who says that, after the will was made, he had a conversation with the testator on the subject, in which he seemed to have a strong feeling against his Baltimore relations, and Mr. Kinney adds, " he had got an idea that they wanted to put him into a lunatic asylum, and that they were trying to entice him off, but he was determined to stay here." Mrs. Bingham's own testimony produces the conviction that she exerted her influence over him, (which is shown to have been great,) against his father's executors and his sister Emma, in this direction. To the question, " Did you ever talk to Tommy about the asylum, at all, afterwards?" she answers, " I don't remember that I did; I might and I might not. In calling Doctors Ward

and Dougherty" (the physicians just referred to) "I men-
tioned to them, when they entered, what their purpose was in
coming; then I said Doctor, I am particularly anxious to
have your opinion and certificate as to whether Tommy is a
fit subject for the hospital, because of what Messrs. Linthicum
and Alexander" (the executors) "had told me they always
had—they made no secret of it; and if, in the event of my
absence or sickness, they ever took Tommy to the hospital, I
wished to have their certificates, so that I could take him
right out, and so I made that remark distinctly at that time
to the doctors." She further testifies as follows:   Q. "Did
you ever tell Tommy that they were going to take him to the
asylum?"   A. "Did I ever tell Tommy?"   Q. "Yes."
A. "I don't remember it."   Q. "Do you remember his tell-
ing you that you lied when you did say so?"   A. "Tommy
never used such words to me, and I never heard him use such
words in the house."   Q. "Then it was all a delusion in his
letter, was it?" (referring to his letter to Julian J. Alexander,
of June 21st, 1872,) "in which he says: Did you tell
Missey" (meaning Mrs. Bingham) "in your letter that she
must pack my clothes up, that you were coming on and take
to a asylum. I told her she lie."   A. "He may have said
it, if he wrote it, and I never paid any attention to it."   Q.
"He wrote this on the 21st of June?"   A. "What dates were
those letters you have read in court—what years were they
written?"   Q. "He writes on the 21st of June, 1872, that
Missey had told him that they" (the executors) "had told
Missey that they were going to take him to an asylum, and
he says I told her she lied—is that a mistake?"   A. "Am I
called upon to express my opinion of those letters?"   Her
counsel then said to her "No, you are called upon to state
whether that is a mistake or not." She then replied, "I de-
cline to answer the question." Her further examination on
this subject is of the like character, and closes with her refusal
to swear whether she did or did not tell the testator that the
executors were trying to get hold of him to put him into a
lunatic asylum. She admits, however, that, in fact, they

never did tell her that they were going to send him to an asylum. Her influence over him appears in the testimony of Mary D. Davis, a witness for the proponents. She was a frequent visitor at Mr. Alexander's house. She says, Mrs. Bingham's treatment of the testator was always very kind, but she adds, " of course she had to be firm." To the question, " What control had she over him; why had she to be firm and restrain him ? " she answers, " Because no one else in the house could." Mrs. Bingham says that the certificates which she obtained from the physicians were procured at the testator's request, and if that be so, it is not difficult to understand what was the condition of such a mind as his under such circumstances. The certificates are addressed to her, and thus, and by other internal evidence, show that the examination was by her procurement. Dr. Ward certified that he had, long before that time, arrived at the conclusion that the testator was semi-imbecile, and that his defective mental development was congenital, and he added, that his case was, without doubt, incurable. He further certified that he did not look upon him as insane in any sense, and was fully satisfied that it would be an act of injustice to place him in an asylum for the insane. He added to his certificate a statement that he considered him competent to make a will. The certificate of Dr. Dougherty is of a like character. He testifies as follows, referring to the examination by him and Dr. Ward ; (the latter died before the trial in the Orphans Court) : Q. " Was anything said about whether he ought to be sent to a lunatic asylum or not ?" A. " I think such a question was raised ; I think that was one of the objects of our inquiry, to determine whether he should be taken away from her control and put into an insane asylum ; she preferred to have the control of him after his father's death." Q. " Did she say anything to you that led you to suppose that anybody was trying to take him away and put him into a lunatic asylum ?" A. " I think that was so ; I got that impression." Q. " Did you get the impression as to who she said was endeavoring to get him away and put him into a lunatic asylum ?" A. " I don't

In the matter of the will of Thomas Alexander.

remember any individual, but my impression is, it was some of the members of the family who were desiring to do that." He further testifies that the testator seemed to be apprehensive that he would be sent to an asylum, and he did not want to go there. He, indeed, says that he and Dr. Ward, "mostly wanted to find out what his capacity was, if he had any property to dispose of;" but he also says that the principal object of the examination was to determine whether it was proper to take him from his sister Mary's custody to the lunatic asylum. That she caused him to make the will, is proved. Leaving out of consideration his statements on that subject to Mrs. Price and his sister Emma, to the former of whom he said that Mrs. Bingham had told him that if he did not make his will in her favor, she would put him into a lunatic asylum, and to the latter that he had to make the will, and that Mrs. Bingham had said if he did not make his will he should not live in the house with her; and that she would give him over to Mr. Linthicum and Julian Alexander, and that they might do as they pleased with him; that they had said they were going to put him into the hospital, and that she intended to give him up to them and let them do as they pleased with him, and that all they wanted was to get him to Baltimore, put him into the hospital, and spend his money; her statement to Julian J. Alexander, one of the executors, is sufficient evidence of the fact. He testifies that about the 5th of January, 1872, (the will was executed on the 2d of that month), she told him that she had had three doctors examine the testator, and that they said he could make a will, and that she "had made him make a will," so that if they, the executors, took him to Baltimore, they would be disappointed. He says that on a previous occasion, she had accused him of conspiring with Mr. and Mrs. Linthicum to take the testator to Baltimore, to get him to make a will in favor of them and their children. It further appears in the evidence, that about a week before the will was made, she told Mr. Kirkpatrick that the testator was coming to his office and wanted him to draw his will, thus making the

arrangement for the drawing and execution of the will, about the time when she obtained the certificates of the physicians. The testator had not signified to that gentleman any intention to make a will. The will was executed on the 2d of January, 1872, two weeks after the examination of the physicians.

The testimony in the cause leads to the conclusion that the paper in question is not the will of the testator, but that by undue influence on the part of the principal legatee, his free agency was virtually overborne. The testator was, according to the testimony of the physicians whom she employed to certify to his condition, a semi-imbecile. He was subject to her control and influence, and she is shown to have exerted a malign influence over him, against his sister, who had equal claims with her to his estate. She appears to have greatly interested herself in the making of the will, as is evidenced by her declaration that she had "made him make a will," and she appears to have provided herself in advance with the means, as she supposed, of sustaining the will against the objection of incompetency, which was obviously to be expected, by obtaining the certificates of physicians on that head. The testator resided with her from the death of their father, in December, 1871, until February, 1873, when she married and left Newark, and went to reside in Philadelphia. From the time when she left Newark up to his death, which occurred in December following, she was in constant correspondence with him. She says she received, on an average, two or three letters a week, and various postal cards, and that he visited her in Philadelphia twice in that time, and would have paid her more frequent visits, but that she was called away from that city. She appears to have kept up constant communication with him, and her influence over him seems not to have diminished. Her testimony, instead of relieving her from the imputation of undue influence, only makes it the more clear that she, in fact, did exert it. The instrument ought not, under the circumstances, to be admitted to probate as his will. The law secures the right of testamentary disposition, neither hedging it about with

unnecessary regulations, nor restricting it by unreasonable limitations or conditions, but it requires that the will shall be, as its name imports, the voluntary, free act of the testator, not coerced by restraint, nor induced by fraud or extreme or unreasonable influence. The decree of the Orphans Court will be reversed.